**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**Baltimore Division**

In re: Case No.: 26-17758-MMH

Jenk's Best Living, LLC Chapter 11

Debtor

_______________________________/

# MOTION TO DISMISS JENK'S BEST LIVING, LLC BANKRUPTCY PROCEEDINGS FOR LACK OF JURISDICTION AND LACK OF AUTHORITY AND ALTERNATIVELY, MOTION TO TRANSFER VENUE

COME NOW, Adversary Defendant YSA INVESTMENTS 1, LLC ("YSA") and files this Motion to Dismiss Jenk's Best Living, LLC ("Jenk's Best Living") Bankruptcy Proceedings for Lack of Jurisdiction and Lack of Authority, and in support thereof alleges as follows:

## I. INTRODUCTION

This bankruptcy filing is yet another result of Marc Kulick's fraudulent conduct, this time, an attempt to use the automatic stay to accomplish in this Court what Kulick and his affiliates could not accomplish in Oklahoma or in Delaware. Having lost at trial in the Delaware Court of Chancery, and having been rebuffed in both Oklahoma state and federal court, Jenk's Best Living now asks this Court to relitigate, under the guise of reorganization, the very issues the Delaware Court of Chancery already decided against Kulick and his affiliates after a full trial on the merits.

The Petition fails at the threshold. YSA foreclosed on the membership interests of Jenk's Best Living well before this case was filed. But neither YSA nor any properly authorized member ever consented to this bankruptcy, meaning the Petition was filed without the corporate authority the Bankruptcy Code requires, depriving this Court of jurisdiction.

Every substantive theory Jenk's Best Living raises here, Kulick's authority, the validity of the mortgage, the usurious nature of the loans, either was raised, or could have been raised, in the Delaware Action, and Jenk's Best Living, as a named Third-Party Defendant there, is barred by res judicata and collateral estoppel from raising it again. The timing and sequence of this filing, arriving only after Oklahoma's state and federal courts declined to credit the same claims, further confirms that the Petition was filed in bad faith, not to reorganize a viable business, but to evade a judgment already entered against Jenk's Best Living's privies. For all of these reasons, dismissal is warranted. In the alternative, should the Court decline to dismiss, this proceeding should be transferred to the District of Delaware, where the operative facts, governing law, and existing trial record already reside.

## II. BACKGROUND FACTS

### A. Kulick Enters into Loan Agreements with YSA

1. In September 2024, Efraim Diveroli ("Diveroli"), a beneficiary of the ultimate parent entity of YSA, was introduced to Kulick. At the time, Kulick controlled and managed (or at minimum represented himself to control and manage) a portfolio of 34 multifamily real estate assets in Oklahoma, Arkansas and Kansas (the "Properties").

2. In 2024, Kulick was in search of short-term financing for one of the Properties. On or about October 8, 2024, YSA and Kulick entered into a certain loan agreement ("October 2024 Loan"). Pursuant to this loan, YSA loaned $775,000, maturing ninety days after closing.

3. Although Kulick ultimately repaid the October 2024 Loan in full, he did not do so until January 21, 2025—approximately 13 days after the maturity date.

4. By February 2025, YSA had loaned Kulick $4,775,000 over six loans. Yet, that month, Kulick approached YSA requesting a $1,500,000 loan, nearly twice the amount of any

previous Loan. In light of Kulick's late repayment of the October 2024 Loan, YSA conditioned any further advances on the provision of additional collateral.

5. YSA agreed based on Kulick's offer to join his "entire portfolio" as part of the incentive to secure the loan—including Jenk's Best Living and its property. **Exhibit 2 (JX 76); Exhibit 3 (JX-185)**. During the negotiation process, Robert Miley ("Miley"), YSA's agent, asked Kulick: "Where this had previously included 17 total entities (4 unencumbered), are we expanding to rest of portfolio? If so, could you please send me a paragraph that I can copy into it with the other entities?" **Exhibit 4 (JX-12).** Kulick immediately responded stating: "The answer is yes and no. I suggest we keep that the same but maybe add a joinder to the portfolio as a whole[.]" *Id.*

6. Miley then asked the group for "consensus on the entity language for the collateral agreement." *Id.* He noted that, given certain covenants in the CPSA, it was critical to keep the unencumbered and encumbered interests separate. Kulick responded stating: "Yes the collateral needs to remain the same but does my idea for a joinder with any asset controlled by any affiliate of mine work?" *Id.* Miley said that the joinder "may" work. *Id.*

7. Miley emailed Kulick updated drafts of the Confession of Judgment and Guaranty. **Exhibit 5 (JX 13).** In the same email, Miley again flagged for the group Kulick's suggestion of adding a joinder to the CPSA. *Id.* He noted that the CPSA does not clearly state which entities are intended to be "unencumbered vs encumbered." *Id.* Kulick responded: "No change to this document at all except to ***add a joinder that joins any asset controlled by any affiliate of mine***." *Id.* YSA's counsel circulated a revised CPSA that included a one-paragraph joinder consistent with Kulick's proposal (the "February Joinder"). **Exhibit 6 at 1, 18, 32 (JX 15).**

8. The portfolio provided by Kulick expressly listed Jenk's Best Living and the property it owns. **Exhibit 7 (JX 185).** Additionally, Jenk's Best Living, a Kansas limited liability

company, was owned 50% by PSC Thrive LLC and 50% by Jenk's Best Living Investors, LLC. (ECF No. 11.) Jenk's Best Living Investors, LLC was in turn a "VESTA MEMBER" in Jenk's Best Living Operating Agreement, with Kulick signing as the authorized representative. (ECF No. 13-2 at p. 42.) Vesta Capital LLC ("Vesta Capital") was listed as Jenk's Best Living Investors, LLC's Promote Member. Vesta Capital is a Kulick company.

9. On February 18, 2025, YSA entered into a loan agreement with Kulick's personal investment vehicles, Asset Holder, LLC ("Asset Holder") and Vesta Holdings, LLC ("Vesta Holdings") (the "February 2025 Loan"). **Exhibit 8 (JX 16).** The February 2025 Loan had a principal amount of $1,500,000 and an interest rate of 133.333% per annum, compounded monthly.

10. The February 2025 Loan comprises a promissory note (the "February Note"); a collateral pledge and security agreement (the "Feb. CPSA"), a Personal Guaranty and Right of First Offer (the "February Guaranty"); and a Joinder. *Id.* The February 2025 Loan is governed by Delaware law. *Id.*

11. The "**<u>Collateral</u>**" was defined as, *inter alia,* the following:

a. Any and all other ***interests in any Entity owned by Borrower or Pledgor***, whether owned at the time the Loan Documents were executed or thereafter acquired;

b. All claims that the Borrower or a Pledgor has against any Entity or its property, whether existing at the time the Loan Documents were executed or thereafter acquired; and

c. ***All rights conferred to Borrower or a Pledgor under any organizational documents*** or agreement, "including all voting and consent rights."

Feb. CPS at § 1.1. The security interest in the collateral attached "automatically to any interests in any entity that Borrower or Pledgor, as applicable, may at any time in the future acquire without any further action by Borrower or Lender." *Id.* at § 1.2.

12. The Feb. CPSA further allowed YSA to file financing statements to perfect its lien on the Collateral "without notice or demand . . . exercise any rights under the UCC, rights and remedies of Lender under this Agreement or otherwise, including but not limited to taking any action against the Collateral or any of the Collateral's real or personal property." *Id.* at § 5.2.

13. Additionally, the Feb. CPSA further defines the term "**Guarantor Entity**" as being "any entity (i) directly or indirectly controlled or managed by [Kulick] or (ii) directly or indirectly owned by [Kulick] in whole or in part with respect to which [Kulick] receives notices in the ordinary course of business." *Id.* at § 3.5.

14. On behalf of the Guarantor Entit(ies), Kulick executed the following "**Joinder**":

> The undersigned, as manager, member or other authorized person of any and all Guarantor Entities and any other entities in which the undersigned does now own or control or may herein after own or control during the term of [the Feb. CPSA], hereby agrees to jointly and severally assume all obligations of Pledgor.

*Id.* at p. 14.

15. The Feb. CPSA was also guaranteed by Kulick individually. The Feb. CPSA Guarantee is attached hereto as **Exhibit 9.** The Feb. CPSA Guarantee granted YSA a broad power of attorney (the "February POA"), which, in relevant part, provided:

> Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. This shall include but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral.

*Id.* at § 7(h).

16. In sum, the Joinder bound the Guarantor Entities as additional Pledgors and subjected them to the CPSA and POA obligations. The primary Collateral remained membership

interests in the listed Intermediate Holding Companies, with the POA authorizing action against real/personal property owned by the Collateral or bound entities.

17. Kulick also entered into an April 2025 loan, a July 16, 2025, loan, and a July 31, 2025, loan, all under the same terms and format as the February 2025 loan. **Composite Exhibit 10.**

18. The April 2025 Loan had a principal amount of $300,000 and an interest rate of 1,500% per annum, compounded monthly. It was a short-term loan intended to finance Kulick's closing costs for the acquisition of an apartment complex in Tulsa, Oklahoma, and was due ten days after closing. The transaction never closed.

19. The July 15, 2025, Loan had a principal amount of $365,000 and an interest rate of 960% per year, compounded daily.

20. The July 31, 2025, Loan had a principal amount of $317,000 and an interest rate of 7,000% per year, compounded daily. The interest rate of this loan was reflective of the very high risk associated with providing the loan with Kulick and its entities, considering that over $2,000,000 were owed.

21. These interest rates (as well as the interest rate for the Feb. CPSA), were fully agreed upon by Kulick. In fact, Kulick testified in separate proceedings (*see infra*) that he proposed the interest rates on each loan by reverse engineering whatever payment he thought appropriate on the loan amount and stated, "I'm not playing the victim on paying high interest rates on my loans. I understand that, you know, my cash position was bad, it was stressed. I was having trouble getting investors to fund pro rata capital calls." *See* Delaware Action transcript attached hereto as **Exhibit 11.** He also acknowledged that he kept returning to YSA because he was "desperate" for funding. *Id.*

22. Jenk's Best Living operating agreement also provides that Vesta Realty LLC ("Vesta Realty"), which Kulick owns, acted as its sole manager.

23. Both Vesta Capital and Vesta Realty were both owned and/or controlled by Kulick.

**B. Kulick Defaults on All the Loans**

24. Kulick (and his entities) ultimately defaulted on all four of these loans (collectively the "Defaulted Loans").

25. As a result of the defaults, which to date Kulick has not attempted to cure, YSA was forced to exercise its remedies under the loan documents.

26. On October 31, 2025, YSA recorded second mortgages against at least 25 Properties located in Oklahoma and Kansas, including the Jenk's Best Living Property. **Exhibit 12.**

27. YSA also filed UCC-1 financing statements covering 100% of the membership interests of Jenk's Best Living (and other entities) and thereafter exercised its rights as a secured party under Article 9 with respect to those membership interests to foreclose on them for purposes of preservation. **Exhibit 13.** As a result, YSA contends that it acquired ownership or control of (at minimum) the Kulick membership interests in Jenk's Best Living.

28. Thereafter, additional remedial steps followed, including the execution of deeds in lieu of foreclosure as to certain properties, while the dispute expanded into serial litigation and bankruptcies across multiple jurisdictions.

**C. Kulick Filed a Lawsuit in Delaware Disputing YSA's Actions**

29. Kulick filed suit in Delaware on November 13, 2025, seeking an order requiring Defendant to remove the second mortgages recorded on the properties. In this lawsuit, Kulick claimed—like Debtors do here—that Kulick lacked authority to record second mortgages directly

on the properties. Kulick further argued that the second mortgages were void. *See generally Marc Kulick, Vesta Holdings, LLC and Asset Holder, LLC v. YSA Investments 1, LLC*, Case No.: 2025-1319-KSJM in The Court of Chancery of the State of Delaware (the "Delaware Action"). The Complaint filed in the Delaware Action is attached hereto as **Exhibit 14.**

30. In addition, Kulick filed a motion for preliminary injunctive relief arguing that the UCC filings with respect to the entities' membership interests were improper. *See* relevant filings in the Delaware Action attached hereto as **Composite Exhibit 15**. Kulick failed to prosecute or otherwise abandoned these specific arguments and therefore, they were never adjudicated.

31. On February 11, 2026, YSA subsequently filed a Counterclaim and Third Party Complaint in the Delaware Action against several entities—including Jenk's Best Living. The Counterclaim and Third Party Complaint is attached hereto as **Exhibit 16**.

32. As noted in the Counterclaim and Third Party Complaint, YSA exercised its rights under Title 9 of the Uniform Commercial Code ("UCC"), codified in Title 6 of the Delaware Code, to take possession of and operate the collateral "for the purpose of preserving the collateral or its value." 6 Del. C. § 9-207(b)(4)(A); see also 6 Del. C. § 9-609(a)(1) (allowing a secured creditor to take possession of collateral after default). This included taking control of the Guarantor Entities, such as Jenk's Best Living.

33. Given Kulick's allegations that YSA lacked the ability to seize the pledged collateral, notwithstanding the loan documents, YSA asked for a declaratory judgment that it has lawful ownership and control over the Third-Party Defendants—including Jenk's Best Living and all of its assets and properties—until the Defaulted Loans are fully paid. In addition, YSA sued for breach of fiduciary duty, specific performance, fraudulent transfers, and unjust enrichment.

34. Jenk's Best Living, despite being named as a party, never appeared in the Delaware Action, never disputed the propriety of the UCC filings, never disputed YSA's foreclosure over (at minimum) Kulick's membership interest, never disputed the second mortgage recorded over the Jenk's Best Living Property, and never disputed it received the benefits of the loans advanced by YSA.

35. On the contrary, Kulick testified that Jenk's Best Living and its other members were aware of the loans and were supportive of his actions if he prevailed in the dispute against YSA. **Exhibit 11 at 118:4-121:10; 166:6-171:21.**

36. On June 9, 2026, after a full trial on the merits, the court in the Delaware Action, entered a Post-Trial Memorandum Opinion attached hereto as **Exhibit 17.** (the "Opinion").

37. Some notable findings by the Delaware Court are restated below:

> Defendant concedes that the Loan Documents did not create a secured interest in the Properties. Rather, they **created a secured interest in the entities that own the Properties**. The Loan Documents also gave Defendant the right to take action against real property owned by those entities, including the Properties [via the Power of Attorney].
>
> Kulick admitted at trial that he signed the Joinder and that he did so "as manager, member or other authorized person of" two broad categories of entities, including "any and all Guarantor Entities" and "any other entities in which [Kulick] does now own or control or may here after own or control . . . ."
>
> Under the CPSA, "Guarantor Entities" includes the Title Owners. The CPSA defined "Guarantor Entities" as "any entity directly or indirectly controlled or managed by [Kulick]," or "directly or indirectly owned by [Kulick] in whole or in part with respect to which Guarantor receives notices in the ordinary course of business[.]"
>
> This definition of **Guarantor Entities** sweeps in the Title Owners in multiple ways. First, the definition **includes entities that Kulick owns in part**. … Second, **Kulick controls or manages the Title Owners**, as he testified at trial.
>
> By defining "action against the Collateral" as a non-exclusive right encompassed …, the language and structure of the **Power of Attorney indicate that the parties**

> **intended for YSA's rights to extend beyond the right to take "action against the Collateral.**
>
> The Power of Attorney thus grants YSA the right, if YSA deems it necessary, to "secure" its interests against those entities bound by the Joinder, including the Title Owners, to facilitate payment of amounts due to YSA. YSA deemed the second mortgages necessary to protect its rights to collect amounts due to it.
> Contrary to Plaintiffs' contentions, **the Loan Documents granted YSA expansive rights to take actions against real property owned by Collateral**.
>
> Kulick also referred in the exchanges that day to "a joinder with any asset controlled by any affiliate of mine," and "a joinder that joins any asset controlled by any affiliate of mine." If Kulick intended the Joinder to be limited to adding entities to stand behind the same Collateral in the CPSA, there would have been no reason to refer to joining "any asset of any affiliate."
>
> Consistent with this contemporaneous evidence, both Diveroli and Miley testified that, prior to the February 2025 Loan, Kulick agreed to pledge his entire portfolio to support the next loan.
>
> Plaintiffs also argue that it does not make sense that Kulick would pledge $900 million worth of additional property to support a $1.5–2 million loan. But Kulick wanted the loans, YSA wanted greater protection, this is the compromise that Kulick proposed and ultimately the deal the parties struck.

*Id.* at pp. 23-36.

38. In addition, the Delaware Court noted that the usury defense was not available because Delaware law, which governed the loan agreements, forecloses this defense where the borrower of the loan is a limited liability company, even where there is an individual endorser or guarantor. *Id.* at 36-37.

39. The judgment confirms that substantial contractual-authority questions arising from the governing Delaware-law documents were litigated and decided in Delaware. This Order was entered as a partial final judgment pursuant to Court of Chancery Rule 54(b), separately appealable as of right, and it is therefore final for purposes of claim and issue preclusion. No appeal from that judgment has been filed.

40. Jenk's Best Living was a named third-party defendant in the Delaware Action. As a party to that litigation, it had a full and fair opportunity to raise and litigate every issue applicable to it. Having failed to appear or contest the claims, it cannot now seek a second bite at the apple in this Court under the guise of a bankruptcy filing.

## III. LEGAL STANDARD

### A. Legal Standard for Dismissal for Lack of Authority

The Supreme Court long ago established that "[t]he initiation of proceedings, like the run of corporate activities, is left to the corporation itself, i.e. to those who have the power of management." *Price v. Gurney*, 324 U.S. 100, 104 (1945). The Court held that "if the District Court finds that those who purport to act on behalf of the corporation have not been granted authority by local law to institute the proceedings, it has no alternative but to dismiss the petition." *Id.* at 106. Applying *Gurney*, the Fourth Circuit has recognized that "where a voluntary petition for bankruptcy is filed on behalf of a corporation, the bankruptcy court does not acquire jurisdiction unless those purporting to act for the corporation have authority under local law to institute the proceedings. *Hager v. Gibson*, 108 F.3d 35, 39 (4th Cir. 1997). Thus, where authority under state law governing the company is found lacking, "the court has no authority but to dismiss the petition."

### B. Legal Standard for Dismissal for Cause.

Section 1112(b)(1) of the Bankruptcy Code provides, in pertinent part, that the court shall dismiss a case under this chapter if, upon notice and a hearing, the movant establishes cause and if it is in the best interests of the creditors and the estate. Section 1112(b)(4) provides a non-exhaustive list of examples of cause sufficient for dismissing a case. This list includes substantial loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation,

gross mismanagement, unauthorized use of cash collateral substantially harmful to creditors, failure to comply with an order of the court, among others.

Further, "[b]ankruptcy is an equitable procedure that is available to those who employ its benefits in good faith." *Herlihy v. DBMP, LLC*, 167 F.4th 142, 151 (4th Cir. 2026). "When a debtor manipulates the bankruptcy procedure for some other purpose or steps outside the equitable limitations of the Bankruptcy Code, his good faith comes into question, placing in doubt any relief he seeks in bankruptcy." *Id.* "Thus, the requirement of good faith permeates the entire Bankruptcy Court[,]" and as a result, "when a bankruptcy court addresses a motion to dismiss a Chapter 11 petition under 11 U.S.C. § 1112(b) (authorizing dismissal for cause), it may consider a lack of good faith as implicit in the 'cause requirement.'" *Id.*

To obtain a bad-faith dismissal, the movant must "show both subjective bad faith and objective futility." *Id.* "The subjective bad faith inquiry focuses on the question whether a petitioner actually intends to use the applicable provision for its intended purpose, i.e., … to reorganize or rehabilitate an existing enterprise, or to preserve going concern values of a viable or existing business." *Id*. The objective futility inquiry focuses on "assessing whether there is no going concern to preserve and no hope of rehabilitation, except according to the debtor's terminal euphoria." *Carolin Corp. v. Miller*, 886 F.2d 693, 701-02 (4th Cir. 1989) (internal quotations omitted).

**C. Legal Standard to Transfer Venue.**

Under 28 U.S.C. § 1412, a district court (or bankruptcy court exercising that authority) "may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties." The statute is disjunctive: transfer may be

granted either in the interest of justice **or** for the convenience of the parties. *See* Fed. R. Bankr. P. 1014.

Courts evaluating a motion to transfer under § 1412 typically consider the following non-exclusive factors under the "interest of justice" prong: (1) whether transfer would promote the economic and efficient administration of the bankruptcy estate; (2) whether the interests of judicial economy would be served by the transfer; (3) whether the parties would be able to receive a fair trial in each of the possible venues; (4) whether either forum has an interest in having the controversy decided within its borders; (5) whether the enforceability of any judgment would be affected by the transfer; and (6) whether the plaintiff's original choice of forum should be disturbed. *Blanton v. IMN Fin. Corp.*, 260 B.R. 257, 266 (N.D.M.D. Jan. 29, 2001).

Under the "convenience of the parties" prong, courts commonly examine: (1) the proximity of creditors to the court; (2) the proximity of the debtor to the court; (3) the proximity of witnesses necessary to the administration of the estate; (4) the location of the assets; (5) the economic administration of the estate; and (6) the necessity for ancillary administration if liquidation should result. The most significant factor is generally the economic and efficient administration of the estate. The party seeking transfer bears the burden of demonstrating that transfer is warranted. *In re Grand Dakota Partners, LLC*, 573 B.R. 197, 201-02 (Bankr. W.D.N.C. Aug. 28, 2017).

## IV. LEGAL ARGUMENT

### A. Jenk's Best Living Lacked Authority to File this Bankruptcy Petition.

Mr. Zvi Guttman, purportedly as Chief Restructuring Officer of Jenk's Best Living, executed a Resolution Authorizing Bankruptcy Filings. (ECF No. 1.) Mr. Guttman had no authority to do so.

Following Kulick's defaults, YSA exercised its rights as a secured party under Article 9 of the Uniform Commercial Code and foreclosed on the membership interests of Jenk's Best Living, On January 26, 2026, YSA filed a UCC-1 financing statement covering "100 out of 100 Membership Interests of Jenk's Best Living, LLC." YSA thereafter completed a foreclosure with respect to those membership interests.

This foreclosure is fully consistent with the Delaware Court of Chancery's rulings. The Court held that the loan documents "created a secured interest in the entities that own the Properties" and that the Power of Attorney "grants YSA the right, if YSA deems it necessary, to 'secure' its interests against those entities bound by the Joinder, including the Title Owners." **Exhibit 17** at 28, 31. By foreclosing on the membership interests of Jenk's Best Living, YSA acquired ownership and control of the Company. Yet, YSA never authorized Jenk's Best Living or Mr. Guttman to file the instant bankruptcy.

Even if the Court were to conclude that the foreclosure reached only the Vesta/Kulick-side 50% interest in Jenk's Best Living, as well as their managerial interest, the result is the same. Under Jenk's Best Living's Amended and Restated Operating Agreement, material actions, including the decision to place the Company into bankruptcy, require the consent of the members. (ECF No. 13-1 at § 8.2(e).) Because YSA, as the owner of the at least 50% foreclosed membership interests and Kulick's managerial interests, never authorized the bankruptcy filing and never appointed Mr. Guttman as Chief Restructuring Officer, the petition was filed without the required authority.

As a result of these incurable deficiencies, this Court does not have jurisdiction over the instant case. *Price v. Gurney*, 324 U.S. at 106; *Hager v. Gibson*, 108 F.3d at 39. Dismissal is therefore mandatory.

**B. Jenk's Best Living Cannot Seek to Relitigate the Validity of the Loan Documents in This Court.**

i. *Res Judicata*

Under the doctrine of res judicata, or claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. *Pueschel v. United States*, 369 F.3d 345, 354 (4th Cir. 2004). "For the doctrine of *res judicata* to be applicable, there must be: (1) a final judgment on the merits in a prior suit; (2) an identity of the cause of action in both the earlier and the later suit; and (3) an identity of parties or their privies in the two suits." *Id.* at 354-55. All of these elements are met here.

*First*, the Delaware Court of Chancery entered a final judgment on the merits after a full trial. The Post-Trial Memorandum Opinion fully adjudicated the validity and scope of the loan documents, the Joinder, the Power of Attorney, and YSA's right to record second mortgages on properties owned by the Title Owners, including Jenk's Best Living.

*Second*, there is an identity of the cause of action. Whether identity exists "turns on whether the suits asserted therein arise out of the same transaction or series of transactions or the same operative facts." *Id.* at 355. The Delaware Action and the claims Jenk's Best Living now asserts in this Court all arise from the identical nucleus of facts—the negotiation and execution of the loan documents, the Joinder signed by Kulick, the Power of Attorney, the recording of the second mortgages, and the parties' respective rights thereunder. Indeed, Jenk's Best Living makes here many of the same allegations and arguments that Kulick made in the Delaware Action: that Kulick lacked authority,[1] that the mortgage of the property is invalid, and that the loans were usurious.

---

[1] Kulick admitted at trial that he signed the Joinder and that he did so "as manager, member or other authorized person of" two broad categories of entities, including "any and all Guarantor Entities" and "any other entities in which [Kulick] does now own or control or may here after own or control . . . ." **Exhibit 17 at p. 29.**

When, as here, the same transactions are involved in both actions, the Fourth Circuit has recognized res judicata bars the second action. *Keith v. Aldridge*, 900 F.2d 736, 740 (4th Cir. 1990).

Even assuming Jenk's Best Living has now developed additional defenses or theories, it is nonetheless precluded from asserting in this Court any claims that arise from the same underlying transaction and that could have been brought in the Delaware Action. *See, e.g., Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 163–64 (4th Cir. 2008) (res judicata bars claims that could have been brought in the prior action and are based on the same evidentiary facts); *Providence Hall Assocs. Ltd. P'ship v. Wells Fargo Bank, N.A.*, 816 F.3d 273, 282 (4th Cir. 2016) (second prong satisfied where both cases arose from the circumstances surrounding the same agreements).

*Third*, there is an identity of parties. Jenk's Best Living was expressly named as a Third-Party Defendant in YSA's Counterclaims and Third-Party Complaint in the Delaware Action and was identified as one of the Title Owners whose property was subject to the second mortgages. As a named party, it had a full and fair opportunity to appear, defend, and litigate every issue applicable to it. It failed to do so. The presence of additional parties in the Delaware Action does not defeat identity of parties where, as here, Jenk's Best Living itself was a named party. *See Harnett v. Billman*, 800 F.2d 1308, 1312 (4th Cir. 1986).

Because all three elements of res judicata are satisfied, Jenk's Best Living is barred from relitigating the validity of the loan documents, the Joinder, the Power of Attorney, and the second mortgage on its property, Kulick's authority, and any other claims that could have been brought in the Delaware Action. It had a full and fair opportunity to raise these issues in the Delaware Action and failed to do so. It is not entitled to a second bite at the apple in this Court. *First Union Commer.*

*Corp. v. Nelson, Mullins, Riley, & Scarborough (In re Varat Enters.)*, 81 F.3d 1310, 1315 (4th Cir. 1996) (The doctrine of res judicata applies in the bankruptcy context.)

ii. *Collateral Estoppel*

Similarly, the narrower doctrine of issue preclusion or collateral estoppel also bars re-litigating issues that were actually and necessarily determined in the Delaware Action. Collateral estoppel applies when (1) the issue sought to be precluded is identical to one previously litigated; (2) the issue was actually determined in the prior proceeding; (3) the determination was necessary to the decision; (4) the prior judgment was final and valid; and (5) the party against whom preclusion is asserted had a full and fair opportunity to litigate the issue. *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004).

Each element is satisfied here. The Delaware Court of Chancery, after a full trial on the merits, actually and necessarily determined the meaning and scope of the Joinder and the Power of Attorney. The Court held that the Joinder bound "any and all Guarantor Entities" and any other entities that Kulick owned or controlled in whole or in part; that the definition of "Guarantor Entities" includes the Title Owners (including Jenk's Best Living); that by operation of the Joinder each Title Owner assumed the obligations of the Pledgor under the CPSAs; and that the Power of Attorney granted YSA expansive rights to take action against real or personal property owned by the Collateral and the entities bound by the Joinder.

Those precise issues are identical to the contractual-interpretation questions Jenk's Best Living now seeks to relitigate. The determinations were essential to the Delaware Court's judgment upholding YSA's right to record the second mortgages. The judgment is final. And Jenk's Best Living—expressly named as a Third-Party Defendant and identified as one of the Title Owners—had a full and fair opportunity to litigate these issues. It failed to appear or contest them.

Jenk's Best Living is therefore barred by collateral estoppel from relitigating the meaning and scope of the Joinder, the Power of Attorney, and YSA's resulting rights with respect to the Title Owners and their property.

iii. <u>*Claim Preclusion*</u>

Like res judicata, claim splitting "prohibits a plaintiff from prosecuting its case piecemeal, and requires that all claims arising out of a single wrong be presented in one action." *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 329 F. Supp. 2d 574, 579 (D. Md. 2004). For the reasons stated above, Jenk's Best Living's attempt to challenge the loan documents and second mortgage here—after failing to do so as a named party in the Delaware Action—is precisely the kind of claim-splitting the doctrine forbids.

**C. This Bankruptcy Proceeding Should Further Be Dismissed for Lack of Good Faith.**

"The right to file a Chapter 11 bankruptcy petition is conditioned upon the debtor's good faith—the absence of which is cause for summary dismissal." *In re Premier Automotive Servs., Inc.*, 492 F.3d 274, 279 (4th Cir. 2007) (citing *Carolin*, 886 F.2d at 698). "[A] good faith requirement prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes." *Id*. "The good faith standard also 'protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons (i.e., avoidance of liens, discharge of debts, marshaling and turnover of assets) available only to those debtors and creditors with clean hands.'" *Id.*

To dismiss a case for lack of good faith, this Court must find both objective futility and subjective bad faith. *In re Colonial Warehouse, LLC,* No. CA 13-00662-DD, 2013 WL 2190162, at *3 (Bankr. D.S.C. May 21, 2013). The objective futility inquiry focuses on whether there exists any realistic prospect of rehabilitating a viable going concern. *Carolin Corp. v. Miller*, 886 F.2d

693, 701–02 (4th Cir. 1989). Where "there is no going concern to preserve and no hope of rehabilitation, except according to the debtor's terminal euphoria," the Chapter 11 petition is objectively futile and must be dismissed. *Id.*

Here, that standard is met. YSA has already foreclosed on the membership interests of Jenk's Best Living and, pursuant to the Delaware Court of Chancery's final judgment, holds lawful ownership and control of those interests and the associated rights under the loan documents. Of the Debtor's $938,702,797.27 in total scheduled liabilities, YSA's claim alone accounts for approximately $921 million—roughly 98 percent. The Debtor's sole notable asset is an Oklahoma apartment building already encumbered by the second mortgage that the Delaware court upheld after a full trial on the merits. Because the Debtor is barred by res judicata and collateral estoppel from relitigating the validity of that mortgage, the Joinder, or YSA's rights under the Power of Attorney, there is simply no unencumbered going-concern value left to reorganize and no realistic path to a confirmable plan. The petition therefore bears no relation to the statutory objective of resuscitating a financially troubled but viable enterprise and is objectively futile.

The subjective bad faith prong "asks whether a Chapter 11 petition is motivated by an honest intent to effectuate reorganization or is instead motivated by some improper purpose." *In re Premier Auto. Serv., Inc.*, 492 F.3d 274, 280 (4th Cir.2007).

The subjective bad faith of this proceeding is established by the timing and forum sequence of its filing. They first pursued their claims in Oklahoma state court, relying on a declaration from Kulick to support those claims. *See* Declaration of Marc Kulick attached as **Exhibit 18.** A declaration in which Kulick swears that he "made clear" to YSA that the interests he pledged "did not own or control the underlying assets and did not have the right or power to mortgage or pledge

the property owned by Jenk's Best Living, LLC," and that he "did not, and could not, grant [YSA] a security interest in Jenk's Best Living, LLC or the [p]roperty." *Id.* at ¶¶ 4, 13.

That sworn statement is irreconcilable with the trial record in the Delaware Action, where Kulick admitted signing the Joinder "as manager, member or other authorized person of" both "any and all Guarantor Entities" and "any other entities in which [Kulick] does now own or control or may hereafter own or control." **Exhibit 17** at p. 29. The Delaware Court of Chancery relied on this admission in finding that the Joinder bound the Title Owners, including Jenk's Best Living, and that Kulick had authority to bind them. Jenk's Best Living and its principals then removed the action to federal court in Oklahoma on a fraudulent joinder theory and sought emergency TRO relief. **Exhibit 19.** Only after the Oklahoma state and federal courts declined to hear, or refused to credit, their claims did Jenk's Best Living file this bankruptcy petition in Maryland. That pattern of serial forum-shopping, standing alone, is exemplary of bad faith.

Jenk's Best Living knew of YSA's counterclaims and the Delaware litigation, knew that YSA had filed UCC-1 financing statements, and knew, as a matter of law, that the filing of this petition was unauthorized for the reasons set forth above. A debtor that files bankruptcy with full knowledge that the filing is unauthorized, and while bound by an adverse judgment it seeks to evade, has not filed in good faith. *In re Colonial Warehouse, LLC*, No. 13-00662-dd, 2013 WL 2190162 (Bankr. D.S.C. May 21, 2013).

In short, the attempt to use this Court as a second forum to attack a final Delaware judgment is itself strong evidence of bad faith. Chapter 11 exists to reorganize viable businesses, not to relitigate issues already decided after a full trial. *See, e.g.*, *In re Kelly*, 656 B.R. 541, 594 (Bankr.D. Md. Dec. 11, 2023) (identifying an attempt to relitigate issues already adjudicated by the court as a bad-faith consideration).

**D. Alternatively, the Court Should Transfer this Proceeding to Delaware**

In the alternative, this proceeding should be transferred to the District of Delaware under 28 U.S.C. § 1412, which authorizes transfer "in the interest of justice or for the convenience of the parties." The moving party bears the burden of showing by a preponderance of the evidence that either prong is satisfied. *In re Grand Dakota Partners, LLC*, 573 B.R. 197, 201-02 (Bankr. W.D.N.C. Aug. 28, 2017). Both are satisfied here.

i. Interests of Justice

Courts evaluating transfer under the "interest of justice" prong consider: (1) whether transfer would promote the economic and efficient administration of the estate; (2) whether judicial economy would be served; (3) whether the parties would receive a fair trial in each venue; (4) whether either forum has an interest in deciding the controversy within its borders; (5) whether enforceability of any judgment would be affected; and (6) whether the debtor's original choice of forum should be disturbed. *Blanton*, 260 B.R. at 266. Each of these considerations favors transfer here.

The Delaware Court of Chancery has already conducted a full trial on the merits and adjudicated the validity of the loan documents, the Joinder, the Power of Attorney, and YSA's rights against the Title Owners, including this Debtor, a court already intimately familiar with that record can administer this estate far more efficiently than a court starting from nothing, and requiring this Court to reconstruct or re-decide issues already fully litigated in Delaware duplicates judicial effort and risks inconsistent rulings on the same underlying transaction. Delaware also has the stronger interest in deciding this controversy: YSA is a Delaware entity, the governing loan documents are Delaware-law instruments, the underlying transaction and prior litigation are centered in Delaware, and the majority of other Kulick debtors involved in the related bankruptcy

proceedings are also Delaware entities. In contrast, Maryland has no substantive connection to this dispute. In fact, as this Court recognized by issuing an Order to Show Cause, the connection to this forum attenuated—if at all proper. In contrast, consolidating the dispute before a single court that is substantially connected to this dispute, Delaware, reduces the risk that inconsistent rulings from two courts complicate enforcement of any judgment.

Ordinarily a debtor's choice of forum is entitled to substantial deference, but that deference is diminished here because, as set forth above, the choice of this forum is itself part of a pattern of forum-shopping undertaken to relitigate and evade a judgment already entered against the Debtor's privies in Delaware; a forum choice motivated by evasion, rather than by any genuine connection to the district, is entitled to little weight.

ii. <u>Convenience of the Parties</u>

Courts also examine the proximity of creditors to the court, the proximity of the debtor to the court, the proximity of necessary witnesses, the location of the assets, the economic administration of the estate, and the necessity for ancillary administration if liquidation results, with the economic-administration factor typically given the most weight. *In re Grand Dakota Partners, LLC*, 573 B.R. at 201-02.

These factors likewise favor transfer. YSA, the creditor holding approximately 98% of the Debtor's scheduled liabilities, is a Delaware entity, and the Debtor's remaining trade creditors are predominantly Oklahoma-based and are not proximate to Maryland in any event. The Debtor's own principal place of business and sole asset are in Oklahoma, giving it no meaningful proximity to Maryland and, if anything, a closer substantive connection to Delaware through its Delaware-law obligations. The witnesses and documentary record central to this dispute, including testimony already given at the Delaware trial, are already assembled before the Delaware Court of Chancery

and are largely in part located in Delaware. And because YSA has already foreclosed on and controls the membership interests at issue, any liquidation-related administration would logically proceed through the same record and forum that has already adjudicated the parties' rights in those interests, rather than requiring this Court to develop an independent record on issues already resolved in Delaware. The interest of justice and the convenience of the parties both favor transfer. This proceeding should therefore be transferred, in the alternative to dismissal, to the District of Delaware pursuant to 28 U.S.C. § 1412.

**CONCLUSION**

WHEREFORE, for the foregoing reasons, YSA respectfully requests that this Court enter an order (a) dismissing this case for lack of jurisdiction and lack of authority, (b) alternatively, dismissing this case for cause pursuant to 11 U.S.C. § 1112(b), (c) alternatively, transferring this Chapter 11 case to the District of Delaware pursuant to 28 U.S.C. § 1412, and (d) granting YSA such further relief as the Court deems appropriate under the circumstances.

Dated: August 13, 2026

Respectfully submitted,

/s/ *Justin P. Fasano*

McNamee Hosea, P.A.
Justin P. Fasano, Esquire (Bar No. 28659)
6404 Ivy Lane, Suite 820
Greenbelt, MD 20770
Phone: 301-441-2420
jfasano@mhlawyers.com
*Counsel for YSA Investments 1, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 13, 2026, a copy of the foregoing Suggestion of Stay was filed and served via the Court's Electronic Case Filing System on all parties receiving such notification, including those parties listed below.

Elimelech Baruch ebaruch@casperfirm.com

Hugh M. (UST) Bernstein hugh.m.bernstein@usdoj.gov

Ari Scott Casper acasper@casperfirm.com

Christianna Annette Cathcart christianna@dcbankruptcy.com

Justin Philip Fasano jfasano@mhlawyers.com,
jfasano@ecf.courtdrive.com,
tmackey@mhlawyers.com,
mevans@mhlawyers.com,
cmartin@mhlawyers.com,
Fasano.JustinR92003@notify.bestcase.com

Thomas J Gagliardo tgagliardo@gelawyer.com

Gregory J. Jordan gjordan@jz-llc.com

US Trustee - Baltimore USTPRegion04.BA.ECF@USDOJ.GOV

Maurice Belmont VerStandig mac@mbvesq.com,
lisa@mbvesq.com,
mahlon@dcbankruptcy.com,
mac@dcbankruptcy.com,
verstandig.mauricer104982@notify.bestcase.com,
verstandiglaw@recap.email

/s/ *Justin P. Fasano*
Counsel